The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H.D. Armon presiding. Morning, counsel. We'll call 4-22-0770. In re the marriage of Heidi, is it Leitzen? Leitzen? Leitzen. Marriage of Heidi Leitzen and John Leitzen. Could counsel for the appellant please state your name for the record. Michelle Mosby Scott. Thank you, counsel. And counsel for the appellate, could you please state your name for the record. Gina Wood. Thank you. Counsel for the appellant, you may proceed. Thank you, Your Honor. May it please the court and counsel, Ms. Wood. Good morning. I am Michelle Mosby Scott. I represent the appellant in this case, John Leitzen. There are a number of issues before the court today. The first is whether or not the trial court's denial of maintenance was against the manifest weight of the evidence. The second being whether the trial court's award of wife's marital state farm pension to wife exclusively was against the was against the manifest weight of the evidence. The third being whether the trial court's order requiring the equalization payment to be made from a state farm 401k when cash funds were available to make that equalization payment. And the fourth being whether the various evidence that was allowed into testimony over objection should have been allowed. And that is a de novo review. This is one of those cases, as in, as it's true, I think, in a lot of family law disputes where the determination is very much intertwined with the facts of the case. And in this particular case, this was a long term marriage. The parties were married on June 19th of 1999. At the time of filing, at the time of filing, and I'm going to call them husband and wife rather than petitioner, respondent or appellate and appellee just for clarity. In this particular case, the wife was 55 years of age and husband was 48 years of age at the time that the dissolution was filed. The wife was working full time at State Farm and was also employed part time at a library, working primarily Saturdays or a brief period amount of time on a weekly basis. Husband in this case, my client owned and operated a small construction company called Lights and Construction. In addition, there too, periodically during the last few years of the marriage, starting on or about the time of COVID, my client also worked part time at a local bar. So both of these parties had full time employment and part time employment for some periods of time during the divorce. Prior to the end of the divorce, both parties had left their separated from their part time employment and were left with their full time employment and responsibilities. During the course of their marriage, these two folks had two children, Josh and Jayden Lineson. But at the time of trial, these individuals were no longer minors that had to be or were required to be supported by the parties, although one of the adult children lived in the marital residence with my client until the marital residence sold. In regard to husband's income at trial, I think the evidence established that he was making less than $2,000 a month, roughly $1,950 a month, and that he had expenses of roughly $3,800. That did not include housing expenses. And if we looked at wife's income, she had income of roughly a minimum of $7,710 a month and expenses of roughly $4,750. I mentioned that as an important fact because one of the issues that the trial court has to consider in determining maintenance is whether or not there is an ability to pay. This was a strange or unique case in the sense that in most dissolution cases, we don't have income that exceeds expenses and certainly not to the tune of roughly $3,000 per month and then a maintenance award be denied. Trial started in this case on February 4 of 2022. In McLean County, there's a final pretrial prior to trial. And in this particular case, wife did not, in fact, separate from her employment until July of 2022 when the judgment was entered in June of 2022. But she did give notice of her plan to retire and started utilizing her separation date the first week of trial. I think that's important as well because it shows the connection between the date in which she chose to retire in commencement with the trial proceedings. Now, part of the argument and the facts was that my client was kind of a house dad. He was more of a domestic role model in this case as compared to wife. Wife out-earned him throughout their entire marriage substantially. She left for work at about 6.30, 6.15 to 7 a.m. in the morning every morning, even during the time frame when children were being reared. That left my client getting kids up, ready for school, and off to the bus or to the daycare provider. At the time of the marriage and at the time of the divorce, obviously, my client was eight years younger than his wife. He testified in regard to all of the tests that were taken while she was employed at State Farm in order for her to advance, that being roughly 7 to 10 tests to get her CLU, 7 tests to get her CPCU designation, 6 to 10 tests for an FMLI designation, 5 tests to get her FLHC designation, 2 for ACS. All of those are insurance exams that allowed her to continue to be promoted and meet her maximum potential in her career and development. Now, the testimony of wife was that my husband did not perform domestic responsibilities. But when you look at her schedule and the acknowledgement of having to study for these exams during the course of her career, it is impossible for my client's testimony not to be deemed credible. He indicated that he did the majority of the meals, the laundry, the housekeeping. He also did exterior responsibilities and repairs on the home to allow her and afford her the opportunity to advance in her career. And it was clear from the testimony that this couple decided our mom had a substantially greater ability to earn income than did her husband. Counsel, if I could interrupt you just one moment. Good morning. Yes, ma'am. Good morning. With regards to those issues that you raise as to the additional efforts that your client put in with regards to what I will call domestic responsibilities or duties, what opportunities did he forego for himself, though? Sometimes when we discuss these agreements, we talk about one party elected not to proceed with additional education or additional job opportunities to stay home, if you will, and rear children or handle additional domestic duties. What is in the record that shows that, I guess what I'll say, what did he not pursue or what did he forego by doing this? And so I would say that the record reflects that my client's education was only some classes at an associate's degree college. Excuse me. Does the record support anywhere? Is there any testimony where he specifically indicates that I had planned on going to school, advancing my degree or any other type of employment? And I was unable to do so because I accepted these additional responsibilities? No, Your Honor, I don't think there was ever a discussion between the parties that you're not going to do these things and instead you're going to care for the children. I think the evidence was instead that was a role that these parties fell into. This was wife's second family. She had already reared and raised children. And in this family dynamics, it didn't make sense for her to forego career responsibilities to do domestic responsibilities because the husband was never going to make the amount or level of income that his wife was earning. And so I would say that there was a discussion between the parties that each of them utilized to not only in regard to education of the parties, but also simply in regard to the task and the talents that each of them utilized in order to make an income. However, it was undisputed at trial that wife was supportive of him being the one getting the children off to school. There was an acknowledgement that mom or wife was the one who primarily assisted with homework. But other than that, it was pretty clear, I think, from the testimony and the hours committed to her work responsibilities. The dad was the one who took care of the children. In fact, there was additional testimony that folks lived in Hayworth, which is roughly 15 to 20 minutes from Bloomington, which is where mom worked at State Farm. Testimony was even when the children had to go to the doctor or had regular doctor's appointment. It was husband who actually brought them to their providers and mother would join them from work if her schedule allowed her to do so. So this is like many cases where the parties during their marriage figure out what is best for the family unit and what is best for their children. But you're somewhat spot on in the sense that this is much like we would have cases 5, 10, 20 years ago, and sometimes even today, where the female would stay home because they would have lesser ability to earn higher income than their husband. And the husband would pursue his career because it made sense in their partnership. In a partnership, everybody has differing responsibilities. And there's no question that during the marriage, the partnership terms that they implemented between themselves worked out effectively. There was even testimony... What did Mr. Gleitson do before he became self-employed? So prior to him becoming self-employed, he had other positions which were primarily manual labor. And specifically, the history of his employment in this case was that he had had, I believe, two to three other positions before he started Leitson Construction. And Leitson Construction was started because they saw it as a way for him to make as much money as what he was making before, but have potential in regard to flexibility. But also, there was a project going on at their church, a construction project, which my client had been offered. And there's testimony in the record to show that both my client and his wife wanted him to pursue those opportunities. In fact, the level of income that he was making at the time of the divorce was approximately similar to the amount of income that he had earned throughout the marriage. In fact, many years during the marriage, he had earned substantially less than what he was earning at the time. But he had, on one occasion, worked for a company and had voluntarily separated, but he took on another position with a third-party employer. But ultimately, the decision to start Leitson Construction was a decision that the parties made because I think the evidence would support that it seemed to make sense in regard to their family dynamics. Counsel, is my understanding correct that substantial evidence along the lines you just discussed were presented to the trial court during the hearings on this matter? Yes, Your Honor. They were. And is my understanding further correct that the points you have raised on appeal to us and are arguing now were, in fact, all argued to the trial court as well? Yes, sir. That is true. The trial court issued its ruling only after a very impressive, lengthy 20-page of transcript analysis of the facts before it and explaining why it was ruling the way it did. Is that correct? That is correct. Given that the standard before us is that the trial court either abuses discretion and the discretionary calls regarding the issues before it, or were its findings contrary to the manifest weight of the evidence, both of which essentially require us to deem the trial court's conclusions unreasonable, what is there before us that provides a basis to do that? In other words, aren't you effectively arguing in this case that we should simply second guess the trial court's determination? Your Honor, there's no doubt that the trial court heard the evidence that I'm asking you to review. I'm not asking you to second guess it. I am asking you to consider the evidence that the trial court heard and to make a decision that her ruling on these issues were against the manifest weight of the evidence. In fact, I specifically would ask you to consider the fact that there was uncontroverted testimony that the wife in this case said, I would rather quit State Farm than pay her husband maintenance. In addition to that… Didn't the trial court address that and explain how that was a factor in its decision, but it ruled the way it did anyway? The trial court did address the termination or the voluntary retirement of wife in this case. However, how it was addressed, I believe, was inappropriate. For example, in regard to addressing wife's retirement from State Farm, the court makes the statement in the record that the crux of maintenance is whether wife should have retired when she did. And the issue becomes, and the court then says, I'm considering all of these things that I have heard, including that wife testified that she had, since 2016, underwent treatment for cancer, had a desire to retire early, had communicated that to her husband. The court also said that I find wife's testimony credible, despite the fact that wife may have, prior to the divorce, said that she would quit her job or retire other than pay her husband maintenance. The reality is she didn't threaten to quit her job before the divorce. She threatened and told my client, I will quit my job before I pay you maintenance or give you a portion of my pension. The trial court made a credibility determination about that statement. Correct? She did. And she also found that the domestic responsibilities that my client had performed during the marriage were a luxury. That was her word. It was a luxury. And I would tell this court that my concern is that the rules are the same regardless of gender. Whether I am a primary caretaker and carry out domestic responsibilities as a man or a woman, the statute in Illinois is gender neutral. Well, wasn't that based on the fact that your client testified that the nature of his work was such that his schedule was such that he was available to do these things? It wasn't like he was having to sacrifice something else. He didn't actually go to work that early anyway, and she did. And so it just turned out that he was in a better position to do it. I mean, isn't that really what the testimony came down to? Well, I think clearly the testimony was that my client left for work later than wife. And so, therefore, he was able to carry out these responsibilities. But how is this referring to work that way? I mean, they had had discussions about how, you know, you might want to consider some other work because you're not covered by my insurance. If I retire, you're not going to be covered. And those discussions were held during the course of the marriage, weren't they? No, there was a discussion during COVID where wife asked husband to consider getting third-party employment because during COVID, his work was negatively impacted by COVID economically. She asked him to consider doing that at that time, but that was really the only time that she had asked him. And it wasn't about her retiring. There were only two discussions in the record regarding her retirement. The one was when she got cancer, and she indicated to her husband, if her cancer came back, she would consider retiring early. Her cancer didn't come back. The second discussion was during the divorce when she instructed him that she would quit her job before she paid him maintenance or before she gave him a portion of her retirement. So, this kind of self-help measure of, I'm going to quit on the eve of trial. I'm going to take early retirement, provide no evidence whatsoever to support that her decision to retire was in any way related to the work environment, and it was clear it was not related to her health issue. Both parties— I'm back to where Justice Steigman was asking you the question. Really, that was a credibility determination by the trial court. The trial court concluded that it was a statement made in the heat of the anger and emotion of the divorce proceeding, correct? I don't think that is exactly correct, but— I'm not using the right words, I understand. But is that basically what the crux of the court's conclusion was with regard to that statement? That it was really more a statement in the heat of the emotion of a divorce proceeding? She referenced, as I had stated earlier, that she considered that being a statement made prior to the divorce, but she didn't know the context. But both parties testified to the context and the fact that the conversation occurred during the divorce at the marital residence. In addition to that, Your Honor, there has to—I see my time is up, Your Honor. All right. Well, you will have an opportunity on rebuttal. Thank you, Judge. Thank you, Counsel. Counselor for the appellate, you may proceed. Thank you. Good morning. May it please the Court and Counsel. I want to start with the standard of review issue in this case because I believe the appellant has misstated the appropriate standard of review. I believe all four issues presented by the appellant to this court fall within the abuse of discretion standard. The only manifest weight review that could be applied would be in reference to property issues if, in fact, there were factual issues in dispute on the property. There are not factual issues in dispute on the property issues. Those are all legal. And so I'd submit to this court that I believe the standard is one here of abuse of discretion, which we know is the highest standard of review next to no review at all. And it obviously doesn't allow litigants simply to come to this court to ask the court to reconsider orders from which they disagree or with which they disagree. There is a duty to show this court how the trial court's determinations were such that no reasonable person would take the same views. In reference to maintenance, I note in this case that the factor that was emphasized the most by husband, which is often the case in many situations, at least the ones I'm familiar with, was a focus on income disparity. That was the argument with which he spent the most time presenting evidence. However, as this court has already indicated, this largely came down to a credibility assessment by the trial court. And we all know that trial courts are given wide discretion and great latitude for the very reason that only the trial judge has the ability to personally observe the parties and their witnesses. In this case, it was particularly paramount that this court was able to see the mannerisms, the gestures, the tone and tenor of the voices throughout these proceedings, none of which can be aptly, accurately, or authentically tendered to this court. And so when looking at the income alone, even if we apply Heidi's pre-retirement income to the statutory formula and ignore all of the other factors, it is clear this court did not believe Mr. Leitzen as it related to the evidence he presented regarding his income. He tendered a financial affidavit, which under cross-examination he could not explain in any detail as to how he arrived at a gross income of only $1,921 per month, which equates to just over $23,000 a year, although it can be inferred that he must have averaged a few years of his tax return reported income. What Mr. Leitzen failed to do at trial, and I believe the court very much considered this, is to refute the fact that Heidi presented very specific evidence that contradicted his financial affidavit and his tax returns, particularly coming from his very own profit and loss statements, expense details, spending through bank accounts, and so forth. The calculations we tendered to the court showed that Mr. Leitzen was earning anywhere between $48,000 and $63,000 per year gross, most of which, obviously, because he didn't claim that income, went untaxed to him. And therefore, if applying that to the statutory formula and using Heidi's pre-retirement income at State Farm, no maintenance is owed. So this court would have to find that the trial judge abused its discretion as it relates to John Leitzen's income before even addressing whether or not Heidi Leitzen's retirement from State Farm was appropriate, because the numbers result in a zero maintenance payment. And I believe, for whatever that's worth, that the record also supports our common sense that a 47-year-old man who has spent 17 years owning his own company certainly has the capacity to earn the amount of income which we used for our calculations, but more importantly, his own business records, in fact, supported that that's what he was earning. But even if this court were to determine that that income is not what we stated to be and what Mr. Leitzen failed to refute, in regard to the issue of Heidi Leitzen's retirement, what stands out in this case more than anything is that Mr. Leitzen said a few times during trial, and that's where we wish you could have seen him and actually heard his testimony firsthand, that essentially he wants to be his own boss. He likes the luxuries of self-employment. He would not even think about looking at other employment that might be more lucrative or meet his needs, because he doesn't have to. But the expectation for his wife, who is eight years his senior, has spent 30 years in a very stressful position at an ever-changing company here, State Farm, who had battled cancer, survived that, but had ongoing health issues, and had told him uncontradictedly throughout the last several years of the marriage, it was her hope to retire at age 55. She did, in fact, work to 57 so that Mr. Leitzen would have health insurance benefits, which would expire upon the entry of the divorce anyway. She could not do the same. His argument is she is locked in, and he is free to do whatever he wants, regardless of whether or not it's appropriate or meets his needs. I believe the court was appropriate, and certainly we cannot determine that the court was arbitrary, failed to apply conscientious judgment, or entered findings or rulings in this regard with which no other reasonable person could concur. Moving on to the State Farm Pension Division. Illinois law clearly provides it's within the trial court's province, and again, wide discretion to determine how to value and allocate property within a divorce. An equitable distribution does not demand an equal one, and we've cited to a number of cases supporting that distributions can be anywhere from zero to 100%. Per the Willey decision, retirement accounts are apportioned with the same discretion. We know courts are permitted to award more or less than 50% of any asset or liability and of the marital estate itself to a party. Pursuant to the relevant economic circumstances of each of these parties, this trial judge awarded a relatively small defined benefit account to Heidi. The court also denied Heidi maintenance, which is a relevant factor pursuant to 50310, and awarded 100% of the construction business and the largely untaxed income it provides to John exclusively. This determination is in line with the preference for courts to place within the hands of each party, a definable and ascertainable portion of property, thereby providing a high degree of finality and allowing parties to plan their futures accordingly. The appellant has again failed to show how this decision can be considered to have been made arbitrarily without the exercise of ex conscientious judgment, or as one with which no other person would concur. I would also submit that there is no legal authority, nor has one been tendered by the appellant that the trial court aired in any way by failing to demand some type of other evaluation for this asset. Now the appellant doesn't tell us what that valuation would look like, but even if the appellant had suggested that perhaps an expert conducting a forensic valuation would be required, there's no authority that provides for that. In fact, our relevant cases indicate that although it may be preferential or beneficial in some cases to have that, it's not required. In this case, since the pension, excuse me, was vested and would be in pay status within just a few months following trial, and both parties in the court knew exactly what would be paid, the court had ample information from which to make its final determination. Both parties chose to utilize this information as the value for the court's consideration. It is now improper for the appellant to shift blame upon the trial court for his failure to provide any other type of information he wished the court to consider, despite the significant period of time in which he could have done so. Also, there's no authority for the assertion that the court could not allocate this asset in any fashion other than a qualified domestic relations order without some other type of valuation. If we were to accept that argument, we would have to accept the proposition that some type of valuation would be necessary, even when a quadro divides a pension disproportionately. Would a quadro, which awarded 100% of the account to Heidi, have made the trial court's order proper in the eyes of the appellant? Of course not. It would make no sense that the absence of a qualified order, which mirrors the direct award of this asset, is what makes this court's order an error. Certainly, our legislature would have included provisions within the very specific section of 5032 of the act if this were intended. And again, relevant case law clearly provides that expert valuations may or may not be helpful but aren't required. In reference to Heidi's 401k account, much of the aforementioned authority and the same standard review applies to this issue as well. Courts are not required, as we well know, to look at each asset and liability individually. The courts must look at the entire marital estate as well as parties' income and other resources as a whole. And a court is certainly permitted to allocate more or less of an asset to equalize other assets and liabilities. This particular defined contribution account was divided with Mr. Leidsen largely as an offset for his like-defined contribution account. That was the largest transfer that was made. That happens in cases every day. Only a very small portion of that was added in order to equalize some bank accounts and vehicles. This court is familiar with the inventory of assets and liabilities in this case. This is a modest estate where the largest assets were the house that these parties sold and divided equally and these defined contribution plans. Although this may not be the appellant's preference, he's failed to state for this court any argument that would support a finding, again, that the judge's decision was an abuse of discretion. Lastly, in reference to the appellant's arguments regarding admission of certain evidence, the failure here is he's failed to state how his allegations of trial court error affected the ultimate outcome in this matter, how he was specifically prejudiced or how such rulings were arbitrary, fanciful, or unreasonable to the degree no reasonable person would agree with such. And the appellant has failed to respond to the established law that a trial court's admission of evidence cannot be made in isolation. The court is to consider a number of circumstances, including questions of reliability and prejudice. Unquestionably, Heidi, as with other witnesses and pursuant to the Illinois rules of evidence may testify regarding her state of mind, emotion, sensation, and physical condition. She is permitted to testify regarding her own personal observations, her opinions, and the basis for such. And when we review the court's oral recitation within the record, it really doesn't appear that the trial judge relied much, if any, on the evidence to which the appellant believes was entered in error. Notwithstanding, arguably, in the absence of such evidence, the court would have ruled, in our opinion, in the same fashion. Largely due to the fact that the facts that were in contravention had to be analyzed based upon the credibility of the parties. The court was obviously in the superior position to do so. On top of that, most of the evidence used by the court was affirmed by both Heidi and John and or went unrefuted by John in any meaningful way. For example, it was uncontradicted that John chose the lifestyle and the employment that he was involved in, despite my client asking him for years to consider something different. It was uncontroverted that Heidi suffered from serious health issues, that regardless of such, she continued to work diligently, sometimes at two jobs to help support her family. She consistently talked about retiring at age 55, that the parties even attended a retirement seminar for her five years before the divorce proceedings even commenced, that John refused to consider other employment opportunities, that John's testimony regarding his income conflicted with his own business records and his lifestyle, and that John admitted he should be allowed to dictate the terms of his happiness and work however he deemed fit. But evidently, Heidi could not. So even if this court were to accept that some of Heidi's testimony should have been excluded, I would argue what remains in the record is more than sufficient to support the final judgment. This appeal is simply a matter of the respondent appellant's dissatisfaction with the trial court's order. We are not here today because the trial court abused its discretion in any way. Heidi didn't receive all of the relief she requested either. She wanted to receive the entirety of her 401k and have John receive the entirety of his, based upon her contribution argument, the separate nature of the party's assets, given this was Heidi's second marriage and the fact that John would have eight more years to work and set aside for retirement after the divorce if he worked until the same age she did at retirement, age 57. She did not receive a maintenance award from the court, despite what evidence was available that could have supported such. Yet she cannot and has not argued that the trial court abused its discretion. I submit the appellant court has not shown that either. Quickly, in reference to the domestic duties, the record did not go uncontradicted, as counsel stated, that dad was some kind of a stay-at-home dad. The evidence was that he worked when he felt like working. These parties use third-party daycare for their children. I would submit a lot of two-working-party households are able to raise minor children without someone staying home. Secondly, this court's already commented on the fact, and this was raised at trial, what did Mr. Leitzen give up? He did not present a shred of evidence that indicated that there was any impediment to his ability to work. He wasn't planning to go to school. I believe he was 27 years old when he married Heidi. She had completed college, and she had already spent a number of years at State Farm. This testing council talks about, Heidi discussed, these were very minimal, small, regular tests that State Farm requires of its employees. It was nothing involved where she was spending hours and hours away from her family in order to meet those requirements. Essentially, really, when Mr. Leitzen testified, I really just want to do what I want regardless of how it affects my income, that's the crux of this entire case. Sadly, he is expecting his ex-wife to somehow support that, even if we were to believe that his income is as small as he purports it to be, which I would suggest it clearly is not. I think that's all I have. All right. Thank you, Counsel. Thank you. Ms. Mosby-Scott, rebuttal. Thank you, Your Honor. In this particular case, I also think that the appellate court has to consider the totality of the rulings in regard to determining whether there's been an abuse of discretion. Specifically, this is a case of a long-term marriage where clearly the partnership was that wife was a higher income earner, husband was the one who took on primary domestic responsibilities, household responsibilities, no maintenance is awarded. Then we have a situation where we have cash in a trust account being held by the real estate attorney, which is available to make an equalization payment. And instead, the court determines that that equalization… Excuse me. If I could ask, I mean, when we talk about that, the argument was a moment ago that really the trial court was using the equalization payment with like assets, if you will. Some from the retirement account to balance those retirement accounts. It divided equally the proceeds from the home. Your suggestion is the equalization payment should have come from the cash. Why is that more equitable, if you will? Because a cash and a retirement account are not like kind assets. Taking, for example, Heidi's pension and dividing it by quadro would have been the division of an asset resulting in both parties receiving similar assets. Giving my client a cash equalization payment when cash is available for money he's owed in a distribution is appropriate. But requiring that cash distribution to be from a 401k, that if he wants to convert it to cash, he has to pay ordinary income tax and a 10% penalty. They're not like kind assets. In addition to that, Your Honor, no portion of the pension was awarded to my client. If this case would have played out as it should have, which was both parties working until the age of 65 minimum, my client would have received half of the pension, would have received a maintenance contribution. His wife, offsetting the 401ks and the IRA, are similar like kind assets. If my client takes out money from his IRA, she takes out money from her 401k. The result of that is similar. But when you take a cash payment and make it paid out of a 401k, my client has to do things in order to convert that to cash. That diminishes his cash payment. In addition, there too, the court said in a ruling, well, I've considered the checking account that's available for the business. But now I see last night when I wrote the ruling, I didn't include the credit card. The credit card was, in fact, the two credit card debts for the business were greater than the cash value of the business account. So she said, I'm just not going to consider the business checking. And so again, at every turn in this case, when equity could have been provided, the trial court did not. And we see that again in regard to the objections. The court says, well, I'm going to allow it. I'll overrule the objection. I'm not going to consider it. But then in her ruling, she indicates that there's an impairment in regard to why, as a result of a 2016 breast cancer, which ultimately had never returned. The same as my client had a 2019 benign tumor removed, which never resulted in any other serious medical issues. You're challenging the admission of the evidence in this case pertaining to the health of the wife. And I want to make sure that at the beginning of your argument, you seem to be arguing the standard of review concerning whether the trial court properly admitted that evidence was de novo. Is that your argument? So in regard to the standard of review, as it relates to the overruling of the objections, that is against the manifest weight of the evidence. The lack of division of the pension, I think I argued, was de novo. And if I misspoke, I did not mean to. OK, just wanted a clarification. Go ahead. So as it relates to the issues in regard to those health issues, what if I have a client in a divorce who's 58 years old and 10 years prior had prostate cancer, but it never came back to be an impediment? Is that a reason for him to quit his job? To me, that is nonsensical. And I think a ruling like this, what it will breed is people threatening to quit their job to avoid a maintenance and a pension division. And then they see the outcome in this case and they realize. Like that's never happened before? Excuse me, Your Honor? You mean like that's never happened before? What has never happened, that they've never quit their job? That people don't actually do that? That this is their once in a lifetime occurrence that somehow is going to open the floodgates? Well, for example, if you look at the Smith case and the Ebert case, those are cases where the husband quit his job and the court said, I'm going to impute income to you because you quit your job to evade maintenance. And I believe that's a mirror of the facts of this case, Your Honor. All right. Thank you very much, counsel. We appreciate your arguments. Court will take this matter under advisement and the court stands in recess.